**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

LAZENDRA COLLINS, LAWRENCE TEAGUE, )
WILLIE TEAGUE, )
                **Plaintiffs,** )
                          )
        **v.** )    No. 21-cv-02913
                          )
CITY OF CHICAGO, et al, )    Judge Rebecca R. Pallmeyer
                          )
             **Defendants.** )

<u>**MEMORANDUM OPINION AND ORDER**</u>

In May 2020, civil unrest played out across the country following the death of George Floyd at the hands of a Minneapolis police officer. The City of Chicago was not immune; on May 31, The Brickyard mall in Northwest Chicago was the target of looting. Plaintiffs Lazendra Collins ("Lazendra"), Lawrence Teague ("Lawrence"), and Willie Teague ("Willie") (collectively, "Plaintiffs") drove into the mall that afternoon but did not participate in the looting. They did, however, have an altercation with Chicago police officers who were at the mall responding to the looting—an encounter that ended with the back windshield of Plaintiffs' SUV shattered and Lawrence Teague under arrest for disorderly conduct. Plaintiffs have filed this lawsuit against the City of Chicago ("the City"), Chicago police officers Mark Styczynski ("Styczynski") and Eddie Gollaza ("Gollaza"), and Unknown Officers of the Chicago Police Department (collectively, "Defendants") asserting a host of federal constitutional claims and state law claims against individual Defendants and the City, on a *respondeat superior* theory. Plaintiffs' claims also implicate the actions of Officer Jorge "George" Cerda ("Cerda"), though Cerda is not a named Defendant.

Defendants have moved for summary judgment. As a matter of law, all claims targeting Unknown Officer Defendants are now dismissed, as are all claims against Officer Gollaza, whom Plaintiffs belatedly concede played no role in the events at issue. As explained in detail here, many of Plaintiff's remaining claims against Styczynski and the City are unsupported by the

evidence presented or insufficient to make a case against Defendants as a matter of law. There are, however, issues of disputed fact with respect to (i) Lawrence's Fourth Amendment claim against Styczynski for use of excessive force; (ii) Lawrence's claim against the City for battery based on Styczynski's actions; and (iii) Lawrence's claim against the City for assault based on Styczynski's actions. Though Styczynski is the only individual defendant, the City of Chicago may also be liable, under a theory of *respondeat superior*, for state law claims against its officers. There are disputes of fact precluding summary judgment on some of these claims, including (iv) Lazendra's claim against the City for battery based on Officer Cerda's actions, (v) Willie's claim for battery against the City based on an unidentified officer's allegedly striking Willie with a baton, and (vi) Lawrence's claim against the City for assault based on Cerda's actions.

Defendants' motion is granted in part and denied in part.

## BACKGROUND

Northern District of Illinois Local Rule 56.1 requires that a party moving for summary judgment file a statement of material facts and that a party opposing a summary judgment motion file a response to that statement. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023) (citing N.D. Ill. R. 56.1(a)(2), (b)(2)–(3)). "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." N.D. Ill. R. 56.1(e)(2). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. R. 56.1(e)(3). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement" in the manner dictated by Local Rule 56.1, "those facts are deemed admitted for purposes of the motion." *Johnson*, 71 F.4th at 611 n.13.

Plaintiffs have failed to submit a response to Defendants' Statement of Undisputed Material Facts as required by Local Rule 56.1(b), instead simply presenting their own Statement of Undisputed Material Facts. Defendants therefore ask the court to deem their version of the facts admitted in their entirety. (*See* Defs. Reply [90] at 2–4.) The court notes the violation; but

in the interest of resolving Plaintiffs' claims on the merits, the court will use its discretion to treat facts as disputed where Plaintiffs' submission makes a factual dispute obvious.  *Cf. McDaniel v. Syed*, 115 F.4th 805, 814 (7th Cir. 2024) (appellate courts review the "decision of a district court to enforce its local rules for an abuse of discretion.")

Furthermore, much of the encounter underlying this litigation was captured in a high-quality cell phone video complete with audio.  Except where the video does not capture events that are in dispute, or where reasonable jurors could disagree about what the video shows, the court's factual account relies heavily on this video evidence, construed in the light most favorable to Plaintiffs.  *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024) (video evidence is not to be used when deciding cases as a matter of law unless the video "clearly and definitively discredit[s] the non-movant's facts.")

## A.  Introduction

On May 25, 2020, George Floyd was killed by a police officer in Minneapolis, Minnesota.  (Defs. Local Rule 56.1(a) Statement of Undisputed Material Facts [84] (hereinafter "Defs. 56.1") ¶ 1.)  In the days that followed, protests and civil unrest erupted in cities across the country.  (*Id.*)  On the afternoon of May 31, 2020, there was widespread looting at The Brickyard, a large shopping mall on the Northwest side of Chicago.  (*Id.* ¶¶ 5–7.)  City of Chicago police officers Styczynski and Cerda[1] were assigned to the same police vehicle that day: as Styczynski testified, neither officer was wearing a body-worn camera, as cameras had not yet been issued to their unit.[2]  (*Id.* at ¶ 6; Styczynski IPRA Statement [84-1] at 7:14–8:12.)  Officers Styczynski and Cerda responded and made their way to the mall, where some 500 to 1000 people had gathered.  (Defs.

---

[1]        Defendants' summary judgment papers refer to Cerda as "George," but in his deposition, Cerda testified that his first name is "Jorge."  (Cerda Dep. [84-6] at 6:19–23.)

[2]        Another officer, Piotr Zdrzalka, was also assigned to the same vehicle; it appears that Zdrzalka, who was part of the same unit as Styczynski, also did not have a body-worn camera.  (Defs. 56.1 at ¶ 6; Styczynski IPRA Statement at 8:7–12.)  Zdrzalka is not a defendant in this case and does not appear to have played any role in the events that unfolded.

56.1 ¶¶ 8, 9.)  In an effort to prevent further looting, the two officers began directing vehicles and pedestrians to leave the parking lot.  (*Id.* ¶¶ 12–13.)

Plaintiffs Lazendra, Lawrence, and Willie were also at The Brickyard that day, together with a fourth person, Jonathan Blount, who is not a plaintiff in this case.  (Pl. Local Rule 56.1(a) Statement of Undisputed Material Facts [89] (hereinafter "Pl. 56.1") ¶¶ 11–12; Willie Dep. [84-3] at 14:14–15:5.)  Lawrence and Willie are cousins.  (Lawrence Dep. [84-4] at 15:9–9.)  Lazendra is the mother of Willie's child.  (Willie Dep. at 32:24–33:2.)  Blount is Willie's younger half-brother.  (*Id.* at 15:2–16:8.)  Plaintiffs assert they had driven to The Brickyard to get something to eat; when they noticed a large police presence at the mall, they decided to cut through the mall parking lot with their vehicle to see what was going on.[3]  (*Id.* ¶¶ 10–11).  The vehicle was a Jeep owned by Willie's mother, and Willie was behind the wheel.  (Willie Dep. at 21:24–22:3.)

Lawrence testified that he had a camcorder with him on the day of these events, May 31, 2020, "because [of] all of the protests and everything going on," so that "in case [he] saw anything [he] would be able to document it."  (Lawrence Dep. at 8:22–9:7.)  According to Lawrence, he began recording footage with this camcorder at the time Plaintiffs cut through the mall parking lot.  (*Id.* at 8:14–22.)  Lawrence apparently continued filming with his camcorder throughout much of Plaintiffs' encounter with Officers Styczynski and Cerda, up to the time that Lawrence was eventually arrested by Styczynski.  But the camcorder video is not in evidence, and the camcorder itself is unaccounted for.[4]

---

[3]    Defendants have not conceded that the Plaintiffs only went to The Brickyard that day to get something to eat.  *See* Defs. Response to Pl. 56.1 [91] at ¶ 10.  Defendants have also not suggested, however, that Plaintiffs or Blount were involved in the looting.

[4]    Lawrence testified that after Styczynski arrested him, Styczynski confiscated the camcorder, and Lawrence never got the camcorder back following his release.  (Lawrence Dep. at 128:15–129:15; 144:22–145:3; 183:21–22.)  Plaintiffs' operative Complaint and summary judgment papers nevertheless mention the camcorder only in passing.  (*See* Second Am. Compl. [27] ¶ 30; Pl. 56.1 ¶ 11; Pl. Opp. [88] at 2.)  Defendants' papers do not mention the camcorder at all; their response to the paragraph of Plaintiffs' Statement of Facts mentioning the camcorder does not acknowledge the camcorder's existence.  (Defs. Response to Pl. 56.1 at ¶ 11.)

### B. Initial moments of Plaintiffs' and Defendants' encounter

At some point, Officers Styczynski and Cerda moved from The Brickyard parking lot proper to an entrance to the lot on Narragansett Avenue, the north-south roadway that borders the mall on the east. (Defs. 56.1 ¶ 14.) According to Defendants, a "highly aggressive" crowd was gathered near the parking lot entrance, and "people were throwing bottles and fireworks at the police in the parking lot." (*Id.*) Plaintiffs and Defendants agree that their encounter occurred on Narragansett Avenue near this parking lot entrance but contest the details of how the encounter began.

According to Styczynski and Cerda, Plaintiffs' vehicle, a maroon Jeep SUV, was stopped in the middle of Narragansett Avenue with no cars in front of it and a line of other vehicles behind it. (Defs. 56.1 ¶¶ 15–17, 56–57.) Cerda testified that one occupant of the vehicle was "hanging out from the driver's side" pointing a "small object" at the officers (Cerda does not believe it was a gun). (Cerda Dep. [84-6] at 33:21–34:9.) The two officers then approached the vehicle—Cerda from the back and Styczynski from the passenger side—shouting at the occupants to move the car. (*Id.* ¶¶ 18–19, 59–60.) Once the officers reached Plaintiffs' vehicle, they both tapped on the vehicle with their police batons, continuing to order the Plaintiffs to move. (*Id.* ¶¶ 20, 61.) The vehicle still did not move. (*Id.* ¶ 62.)

Plaintiffs have a different version of the initial moments of their run-in with Styczynski and Cerda. According to Plaintiffs, they were in their car trying to leave the mall area but were "stuck in bumper-to-bumper traffic," not blocking traffic, as the officers claim. (Pl. 56.1 ¶ 12.) Lawrence testified that, from the car on Narragansett, he noticed "a couple of officers" either "roughing" or "chasing" a couple of civilians, and that he said to the officers "hey, I'm recording you, watch what [you're] doing." (Lawrence Dep. at 9:8–19.) Lawrence testified that after a "verbal back and forth" with these same officers, which included him telling the officers to "F off," the officers started "running to the vehicle [that Plaintiffs] were in." (Lawrence Dep. at 9:14–10:2.) Although Lawrence did not identify these officers in his deposition testimony, it is now apparent that the

officers were Styczynski and Cerda, though the pair deny they were "roughing up or chasing" anyone at the time. (Defs. Response to Pl. 56.1 at ¶ 13.)

What happened next would set off the escalating chain of events leading to this lawsuit. Cerda, positioned at the rear of Plaintiffs' vehicle, claims he noticed the reverse lights of the car turn on. (Defs. 56.1 ¶ 63.) When he saw those lights, Cerda recalls, he "reflexively hit the back window of the car" with his baton, causing the window to "shatter." (*Id.*) Styczynski, who claims he did not even realize Cerda had also approached the vehicle, only heard a "loud noise" moments after he (Styczynski) began tapping on Plaintiffs' vehicle and ordering them to move. (*Id.* ¶¶ 20–21.) For their part, Plaintiffs (or at least Lawrence) heard a "loud boom" followed by the shattering of the rear window. (Pl. 56.1 ¶ 14.)

### C. Review of video evidence capturing the encounter.

After Cerda shattered the windshield, Plaintiffs exited their car. At this point in the story, Plaintiff Lazendra began filming the events with her cellphone; Lazendra's footage is described here in present tense. (*See generally* Video [84-7].)

The beginning of the video shows a line of cars on Narragansett Avenue stopped behind Plaintiffs' car, but the camera angle does not reveal whether any cars were stopped in *front* of the maroon SUV. (Video at 0:01–0:06.) Plaintiffs, having exited the vehicle, approach Styczynski and Cerda and, in raised voices, demand to know where the officers' supervisors are and ask for the officers' badge numbers. (Video at 0:03–0:16.) Lazendra then turns the camera toward Cerda and gets closer to him; Cerda nudges his baton in Lazendra's direction, though it is not clear whether he makes contact, and Lazendra shouts at Cerda, "that's a lawsuit, so go right ahead." (*Id.* at 0:17–0:24.) While Lazendra's camera remains trained on Cerda, a voice (later revealed to be Styczynski's) says: "go back to your [expletive] car, man," to which either Willie or Lawrence responds by again asking for Styczynski's badge number. (*Id.* at 0:25–0:28.) Cerda then begins firmly ordering Lazendra, "Go," to which Lazendra responds: "I know my rights as a human being." (*Id.* at 0:29–0:32.) Lazendra points at the maroon SUV, still stopped on Narragansett, and then

back at Cerda, warning him, "you [expletive] up my truck, you're paying for that"; in the background, Willie or Lawrence can be heard shouting that they are "not going no [expletive] where." (*Id.* at 0:33–0:37.) Styczynski exclaims, "I didn't break your [expletive] window!" to which all three Plaintiffs respond by exclaiming that Cerda was the one who broke the window and shouting profanities at Cerda. (*Id.* at 0:38–0:46.)

Styczynski and Cerda make no response to Plaintiffs' request for their names and badge numbers (and it is unclear from the video whether names, badge numbers, or other identifying information were visible to Plaintiffs). Instead, Styczynski and Cerda turn and begin to walk away from Plaintiffs and toward a blue police SUV parked on an entrance road to the mall parking lot. (*Id.* at 0:47–0:51.) Plaintiffs follow, continuing to shout at the officers as they walk towards the blue police vehicle.[5] (*Id.* at 0:52–1:03.) Lazendra's camera angle, facing north up Narragansett away from the mall, is somewhat narrow at this point, but it does not show a crowd of people at the parking lot entrance, as Defendants claim. (*Compare id. with* Defs. 56.1 ¶ 14.) As Lazendra films, Willie comes as close as an arm's length or two to Styczynski, and Styczynski responds by twice swinging his baton at Willie, yelling "get the [expletive] out of here, man"; Willie jumps back from each of the baton swings. (*Id.* at 1:04–1:09.) Another officer (neither Cerda nor Styczynski) then advances toward Willie, causing Willie to retreat a bit further. (*Id.* at 1:10–1:16.) For the next 20 seconds or so, Plaintiffs and Cerda and Styczynski appear to remain in relatively fixed positions as the Plaintiffs continue shouting at the officers, demanding that they call a supervisor and asking for badge numbers. (*Id.* at 1:16–1:35.)

Lazendra, behind the camera, eventually says, "it's ok, I got it on tape, I got it on camera." (*Id.* at 1:36–1:39.) From this point until the moments immediately before Styczynski seizes Lawrence, the video sheds little light on the events in question. As Lazendra moves with the

---

[5]    Styczynski has testified that he believed the Plaintiffs wanted to physically fight him and that a couple of the Plaintiffs (presumably, Willie and Lawrence) adopted "fighting stances" at various points during events to this point. (Defs. 56.1 ¶ 32.) "Fighting stances" are not obvious to the court in this portion of Lazendra's video.

camera back toward Plaintiffs' car, the camera angle jumps around from the blue police vehicle in the entrance road off Narragansett, to a northbound view of Narragansett, and to Plaintiffs' car, still stopped and facing south on Narragansett; Willie comes in and out of the video as he also walks toward the car, while Lawrence, Styczynski, and Cerda disappear from the frame entirely. (*Id.* 1:39–1:49.) Lawrence and Willie can be heard continuing to yell in the background. (*Id.*) A number of bystanders can be seen walking by or observing the scene.[6]

At about the 1:49 mark of the video, the camera turns to Styczynski and Lawrence, who are standing on the sidewalk just south of the camera, directly in front of a group of about 10 onlookers. At this point, Lawrence is just a couple of feet from Styczynski, who swings his baton through the space between them, ordering Lawrence to "get back"; the camera follows Willie as he takes a step back, leaving Styczynski out of frame. (*Id.* 1:51–1:53.) As he steps back into the frame, Styczynski swings the baton toward Lawrence again; this time, Lawrence jumps backward to avoid being struck by the baton, and Lazendra yells at Styczynski to "stop hitting [Lawrence]" as she brings the camera angle closer to Styczynski, putting Lawrence just left of the frame. (*Id.* at 1:53–1:56.) Styczynski then raises his arm, points in the direction where Lawrence has gone out of frame and says: "Right now. He's going to jail." (*Id.* at 1:56–1:57.) The camera whips left to reveal (very briefly) that another police vehicle has pulled up behind Lawrence, and that another unidentified officer is approaching Lawrence. (*Id.* at 1:58.) The camera then turns right and downwards as another officer, soon revealed to be Cerda, swings his baton at Lazendra twice; whether the baton makes contact with Lazendra at this point is not clear. (*Id.* at 1:59–2:02.) By the time Cerda backs away and Lazendra trains the camera back on Lawrence, Lawrence is on

---

[6]     Plaintiffs have claimed that "there were no other people within the vicinity during the entirety of the altercation" (Pl. 56.1 ¶ 19), but their own video shows that this is not true. The camera shows a couple of young men leaving the mall area, walking past the police vehicles and out onto Narragansett; additional people across the street on the opposite sidewalk of Narragansett, looking in the direction of the camera; and finally, a group of about 10 people standing no more than 10 or 20 yards southward on the same sidewalk of Narragansett as the camera, some of them clearly watching events unfold. Counsel are reminded of their duty of candor to the court. *See* Model R. Prof'l Conduct 3.3(a).

his stomach on the sidewalk, Styczynski is on top of Lawrence, and at least three other officers, in addition to Cerda, are standing within a few feet of the scene. (*Id.* at 2:03.)

Suddenly, a man in a red hat (not identified in this lawsuit) rushes into the frame from the right and shoves Cerda to the ground. (*Id.* at 2:03–2:04.) Chaos ensues as a few of the officers who had been standing near Lawrence and Styczynski leap to give chase; Lazendra swings the camera back across Narragansett to reveal Willie and yet another unidentified man (not the one who shoved Cerda) fleeing on foot and being chased by unidentified officers.[7] (*Id.* at 2:04–2:08.) The camera then follows two officers back to the sidewalk where Styczynski has Lawrence on the ground. (*Id.* at 2:10–2:13.)

Lazendra continues shouting at the officers apprehending Lawrence but then jerks her camera back around to Plaintiffs' car, the maroon SUV still stopped on Narragansett Avenue. (*Id.* at 2:14.) As Lazendra quickly approaches the car, she yells "get out my mom's car" as the video reveals that Officer Cerda (who had been shoved to the ground a few seconds before) is now reaching into the car through the open driver's side door. (*Id.* at 2:14–2:16.) As Cerda steps out of the car and turns in Lazendra's direction, the camera comes within inches of Cerda's face. Cerda yells "get back," the camera jostles and moves backward, and Cerda swings his wooden baton at Lazendra at least twice, all while Lazendra continues yelling at Cerda to get out of the car.[8] (*Id.* at 2:16–2:20.)

---

[7]    Willie alleges that, as he ran away, he was struck with a baton on the backside or lower back but has not been able to identify the officer who struck him. (Pl. 56.1 ¶ 31; Defs. Response to Pl. 56.1 ¶ 31.) This segment of the video does not show Willie being struck by a baton while being chased as he alleges, but it is also clear that the video does not capture the initial moments of Willie's pursuit. The video thus does not conclusively refute Willie's allegation that he was struck by the pursuing police officer.

[8]    Cerda disputes that the video *shows* him making contact with Lazendra at this stage but seems to concede that he did in fact "administer" at least one baton strike at this point. (*See* Defs. Response to Pl. 56.1 ¶ 29; Defs. Mem. [85] at 22.) Lazendra characterized Cerda as hitting her with his baton "over and over." (Pl. 56.1 ¶ 29.) To the extent that "over and over" implies a sustained beating of Lazendra by Cerda, the video clearly discounts that possibility, but a jury could reasonably interpret the video as showing Cerda hitting Lazendra with the baton several times.

After Cerda's use of the baton, Lazendra backs off slightly but continues to yell at Cerda and demand that Cerda return the keys to the SUV, which he has apparently taken from the car; Cerda instead continues to yell at her. (Video at 2:21–2:31.) Lazendra's camera then gets jostled and appears to fall to the ground, as a male voice yells "Zenny, Zenny!" (*Id.* at 2:32–2:41; *see also* Lawrence Dep. at 8:9–10 (explaining that he and Willie call Lazendra "Zenny").) After this point, the camera lens turns up toward the sky, and the video is effectively over, although Lazendra can be heard shouting that her purse is in the car and that Cerda has taken the keys to the car. (*Id.* at 2:42–2:56.)

### D. Disputed portions of Lawrence's arrest not captured by video

As explained above, by the end of this encounter, Lawrence had been arrested by Styczynski for disorderly conduct. Lazendra and Willie were not arrested. (Defs. 56.1 ¶ 38, 80.) The parties present competing versions of the circumstances of Lawrence's arrest, and the video captures very little of this. Styczynski says that "a scuffle ensued after officers, including Styczynski, went to the ground while taking Lawrence into custody, where after Styczynski arrested Lawrence for disorderly conduct." (Defs. 56.1 ¶ 38.) Lawrence testified that he was not quite "body slammed" to the ground, but *was* "thrown" to the ground. (*Compare* Defs. 56.1 ¶ 39 (quoting Lawrence Dep. 123:12–17) *with* Pl. 56.1 ¶ 26.) Lawrence also claims that, shortly after he was taken to the ground and with Styczynski already on top of him, Styczynski hit Lawrence with his baton. (Pl. 56.1 ¶ 27.) Defendants generally dispute Lawrence's characterization of Styczynski's actions and emphasize that Lawrence testified that "he did not know who struck him with a baton while he was on the ground and did not see who did it." (Defs. Response to Pl. 56.1 ¶ 27.) But Lawrence also testified that he believes it was Styczynski, "who had the baton out," as the officer who pulled up behind Lawrence and assisted Styczynski in making the arrest did not have a baton in his hand. (Lawrence Dep. at 121:16–24; *see also* Video at 1:58 (showing assisting officer approaching Lawrence from behind without a baton in his hands).)

The parties also dispute the force with which Styczynski restrained or pinned Lawrence to the ground. Lawrence says that "Styczynski's whole weight [was] pressed upon his back" (Pl. 56.1 at ¶ 27), while Defendants assert that Styczynski had one of his knees on the ground, and thus could not have put all of his weight on Lawrence's back. (Defs. Response to Pl. 56.1 ¶ 27.) It is not clear from the video that Styczynski only ever used one knee to restrain Lawrence, nor does the court understand that an officer's full weight could be exerted only if both knees were in contact with the arrestee. The video does not capture the moments where Lawrence is brought up from the ground after being apprehended, but Lawrence claims (and Styczynski denies) that at that time, Styczynski said to Lawrence: "you act like an animal, you get treated like an animal." (Pl. 56.1 ¶ 32; Defs. Response to Pl. 56.1 ¶ 32.)

## PROCEDURAL HISTORY

Plaintiffs initiated this lawsuit on May 31, 2021, exactly one year after the events described above. The initial Complaint did not identify any of the police officers involved in the case, instead naming as Defendants the City of Chicago and Unknown Chicago Police Officers. (*See generally* Compl. [1].) The City worked with the Plaintiffs to identify the police officers involved in the alleged events (*see* Minute Entry [10]), and Plaintiff's Complaint has since gone through two further iterations. ([13], [27].) At this stage, the only properly named Defendants are the City, Officer Styczynski, and Officer Eddie Gollaza, though Plaintiffs continue to list "Unknown Officers" as Defendants as well.[9]

Defendants filed their joint motion for summary judgment [83] on July 29, 2024. The motion is now fully briefed. (*See* [84, 85, 88, 89, 90, 91].)

---

[9] Plaintiffs' First Amended Complaint had also added as Defendants officers Richard Losik, Charlotte Gonzalez, Jason Blachut, Timothy Sheehan, Brian Azzareto, Stephan Keenan, Leilani Romero, Michelle Ortiz, Araceli Arroyo, and Scott Kniaz. (*See generally* [13].) But soon after, counsel for the City and the officers notified Plaintiffs that these officers "were not present during any portion of the underlying incident that forms the basis for this lawsuit." (Mot. [25] ¶ 2.)

## **DISCUSSION**

Lazendra, Willie, and Lawrence pursue four § 1983 claims against Styczynski, Gollaza, and Unknown Officers based on alleged Fourth Amendment violations: unlawful seizure or false arrest; use of excessive force; failure to intervene; and conspiracy.  The Plaintiffs also pursue four claims against the City on a *respondeat superior* theory stemming from Styczynski, Cerda, and other Unknown Officers' conduct: assault, battery, false imprisonment, and intentional infliction of emotional distress.

Summary judgment is appropriate when the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  As discussed above, the court is mindful that, at summary judgment, video evidence "can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts."  *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

Before discussing the merits of Plaintiffs' claims, the court will clarify which claims against which parties are genuinely at issue in this motion.  First, Defendants have argued, and Plaintiffs have conceded, that summary judgment must be granted to Defendant Gollaza on all claims because, in Plaintiffs' own words, he was "not even at the scene of the attack" and otherwise "played no role in the attack."  (Pl.'s Opp. [88] at 5.)  Gollaza is therefore dismissed from this lawsuit.

The court also dismisses all unnamed Defendants (Unknown Officers) from this case.  The use of fictitious names for parties is "generally frowned upon," but "left within the discretion of the district court."  *K.F.P. v. Dane Cnty.*, 110 F.3d 516, 519 (7th Cir. 1997).  At the outset of litigation, when plaintiffs are "ignorant of defendants' true identity," it may not be possible to name all defendants "until their identity can be learned through discovery or through the aid of the trial court."  *Donald v. Cook Cnty. Sheriff's Dept.*, 95 F.3d 548, 555 n. 3 (7th Cir. 1996).  In this case, Plaintiffs have had the benefit of discovery to identify proper defendants, and by all appearances,

the City sought to assist Plaintiffs in this endeavor before discovery even commenced. (*See* Minute Entries [8], [10].) Plaintiffs have offered no explanation as to why any purportedly liable officers remain unnamed at this stage.

Moreover, as Defendants urge, claims against any Unknown Officers are now time-barred. (Defs. Mem. [85] at 25.) The events underlying this lawsuit took place more than four years ago on May 31, 2020. And the statute of limitations for all claims in this case is two years. *See* 735 ILCS 5/12-202 (statute of limitations for personal injury claims under Illinois law is two years); *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (federal claims under section 1983 "borrow the statute of limitations for personal injury actions in the state in which the cause of action arose.") So even if the Plaintiffs were now to identify the Unknown Officers, they would be protected by the statute of limitations.

Plaintiffs do not appear to take issue with the dismissal of claims against Unknown Officers, except with regards to Officer Cerda. (*See* Pl. Opp. at 17–20.) According to Plaintiffs, their claims against Cerda should not be dismissed because he had "constructive notice of the suit" and "would have been added to the complaint in time" if not for "an error," though Plaintiffs do not explain what this "error" was. (*Id*. at 17.) In any case, as Defendants point out, Plaintiffs have not named or tried to name Cerda as a Defendant, nor moved for leave to amend their operative Complaint. (Defs. Reply [85] at 14.) There are, thus, no claims "against" Officer Cerda in this lawsuit, and summary judgment is granted to all Unknown Officers.[10]

---

[10] Even if Plaintiffs could properly add Cerda as a Defendant at this late stage of the litigation, Plaintiffs' claims against Cerda would not, as they argue, "relate back" to their original Complaint under FED. R. CIV. P. 15(c)(1)(C). (Pl.'s Opp. at 17.) Plaintiffs wrongly assume that because they "intended to sue the officers who attacked them with batons," any failure to name Cerda specifically qualifies as a "mistake" under FED. R. CIV. P. 15(c)(1)(C)(ii). (*Id*. at 18, 20.) But there is no indication that Plaintiffs have failed to name Cerda by a "mere slip of the pen." *Cf. Joseph v. Elan Motorsports Technologies Racing Corp.*, 638 F.3d 555, 560 (claims against "Elan Inc." related back where plaintiff had mistakenly named affiliated entity "Elan Corp." as defendant). Instead, it appears that Plaintiffs simply failed to name Cerda as more than a John Doe even after investigating the incident and identifying 12 other individual defendants in the First Amended Complaint. (*See generally* [13].) As the Seventh Circuit has made clear, "naming a John Doe

As the City recognizes, it may nevertheless be liable under the doctrine of *respondeat superior* for any viable state law claims arising from Styczynski *or* Cerda's actions.[11] (Defs. Mem. at 16); *see also Powell v. City of Chicago*, 197 N.E.3d 219, 223, 2021 IL App (1st) 192145, ¶ 15 (2021) (under Illinois law, "a local public entity is directed to pay compensatory damages for any tort judgment or settlement for which an employee while acting within the scope of his employment is liable.")  In *Gaston v. Ghosh*, the Seventh Circuit explained that for an employer to be held vicariously liable, "the wrongdoer need not be a defendant"; there need be only "an actionable wrong, by a person whose conduct is imputed to the employer."  920 F.3d 493, 497 (7th Cir. 2019).  It follows from *Gaston* that the City can also be held liable for the actions of other Unknown Officers who have been dismissed from the suit, so long as "an actionable wrong" committed by a particular (though personally unidentified) Unknown Officer is clearly alleged.

With Plaintiffs' claims against Gollaza and Unknown Officers dismissed, the court will consider (i) Plaintiffs' federal claims under section 1983, as directed toward Styczynski only, and (ii) Plaintiffs' state law claims as directed against the City on a *respondeat superior* theory, stemming from the actions of Styczynski, Cerda, and any "Unknown Officers" whose individual actions are clearly alleged.  The court begins its analysis with Plaintiffs' federal claims.

## I.      Federal Claims: Fourth Amendment Violations and Conspiracy

### A.  Qualified Immunity

Plaintiffs have charged Defendant Styczynski with unlawful seizure and excessive force under the Fourth Amendment, a failure to intervene in the Fourth Amendment violations of other officers, and conspiracy to violate Plaintiffs' Fourth Amendment rights, all under section 1983. Styczynski has raised qualified immunity as a defense to these federal claims.  (Defs. Mem. at 8–

---

defendant does not constitute a 'mistake' within the meaning of Rule 15(c)."  *Herrera v. Cleveland*, 8 F.4th 493, 498 (7th Cir. 2021).

[11]      *Respondeat superior* does not apply to claims under section 1983.  *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 403 (7th Cir. 2018).

11.) "Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). To overcome Styczynski's qualified immunity defense, Plaintiffs must demonstrate not only (1) that the facts, when viewed in the light most favorable to them, establish a violation of their constitutional rights, but also (2) that Styczynski's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time. *Gaddis v. DeMattei*, 30 F.4th 625, 632 (7th Cir. 2022).

Critically, whether a reasonable person would have been aware of a constitutional right at any given point is not a pure question of fact to be presented to the jury: it is a "mixed question[] of law and fact." *Reher v. Vivo*, 656 F.3d 772, 778 (7th Cir. 2011). To satisfy this second prong of the qualified immunity analysis, Plaintiffs must "point to cases establishing a rule" that would make Styczynski's liability "obvious" at the time of the alleged violation. *Gaddis*, 30 F.4th at 632. These source cases need not be on all fours with the circumstances here, but Plaintiffs may not "rest on generalities" and must instead draw on the "particular facts" of the source cases. *Id.* As the Seventh Circuit has emphasized, "this precision is particularly important in the context of the Fourth Amendment", where it is "sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Because the second prong of the qualified immunity analysis is often determinative, courts may begin their analysis on that prong. *Id.*

### B. Conspiracy

To succeed on their conspiracy claims, Plaintiffs must show that Styczynski and other alleged co-conspirators "had a meeting of the minds and thus reached an understanding" to deny Plaintiffs a constitutional right. *Scott v. Univ. of Chicago Med. Ctr.*, 107 F.4th 752, 758 (7th Cir. 2024). Defendants have argued that the conspiracy claims fail because Plaintiffs "have not established an underlying constitutional violation occurred, nor that Styczynski reached any agreement to inflict constitutional harm." (Defs. Mem. at 15.) Plaintiffs respond somewhat

vaguely that "all the testimony and video evidence" could support a finding that Styczynski and his fellow officers "violated the Plaintiffs' Fourth Amendment rights and conspired [to] do so" (Pl.'s Opp. at 5) but have not cited to a single line of deposition testimony or a single segment of video to support this claim, much less cited any case law.  By failing to respond meaningfully to Defendants' challenge to the conspiracy claims against Styczynski under section 1983, Plaintiffs have waived those claims.  *See Hakim v. Safariland, LLC*, 79 F.4th 861, 872 (7th Cir. 2023) (The Seventh Circuit has "made clear" that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("failure to respond to an argument . . . results in waiver").

Regardless of whether any underlying constitutional claims against Styczynski can survive summary judgment, the conspiracy claims against him must fail.

### C.  Failure to Intervene

Plaintiffs' failure to intervene claims against Styczynski specifically concern the actions of Cerda, who used force against Lazendra, and an Unknown Officer who allegedly struck Willie on the backside with a baton as Willie fled the encounter.[12]  At issue in these claims is whether Styczynski (1) "had reason to know that excessive force was being used" by these other officers, and (2) "had a realistic opportunity to prevent the harm from occurring."  *Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022).  The basic inquiry in an excessive force claim is "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting that officer."  *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021).  As Plaintiffs point out, the Seventh Circuit has made clear that claims that an officer failed to intervene in an excessive use of force "almost always implicate questions of fact for the jury."  *Id.* (quoting *Abdullahi v. City of*

---

[12]      Styczynski cannot "fail to intervene" against his own conduct toward Lawrence. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (liability attaches where the officer fails to intervene "to prevent *other* law enforcement officers" from infringing the constitutional rights of citizens) (emphasis added).

*Madison*, 423 F.3d 763, 774 (7th Cir. 2005)).    On this record, however, Plaintiffs' failure-to-intervene claims nevertheless do not survive summary judgment.

Even assuming Lazendra and Willie were subjected to excessive force, that showing alone would not be sufficient to establish that Styczynski breached a duty to intervene; for Styczynski to be liable, he must have had a reasonable opportunity to step in and prevent those uses of force.[13]  The court agrees with Defendants that Plaintiffs have not made "any serious attempt to explain how it is" that "Styczynski reasonably could have prevented any of the alleged wrongdoing from occurring."  (Defs. Reply at 8.)  In short, while Plaintiffs' briefing on this issue recites a fair bit of case law, it simply does not engage with the facts of this case; indeed, from reading this section of the briefing, one would not know that Plaintiffs were addressing separate alleged uses of force by Cerda and the other unidentified officer.  Plaintiffs begin by stating: "For Defendants to be held liable [under] § 1983, they must have a realistic opportunity to intervene in the other's misconduct. The facts show that this is the case here."  (Pl. Opp. at 12.)  Plaintiffs conclude by proclaiming that a jury could reasonably find that "the officers could have stopped the force from being used." *Id.*  In between, Plaintiffs do not point to a single fact in the record that would tend to show Styczynski could have intervened when Cerda allegedly used excessive force against Lazendra, or when the Unknown Officer allegedly struck Willie's backside with a baton as Willie fled the scene.  The only reference to the record in this section of the briefing reads: "The video evidence clearly shows that Styczynski was aware of the excessive force being used against the

---

[13]    The court also reads Seventh Circuit law to require that the underlying uses of force against Lazendra and Willie be violations of clearly established rights (thus implicating the second prong of the qualified immunity analysis).  In *Gill v. City of Milwaukee*, the plaintiff brought Fifth and Fourteenth Amendment claims against two police detectives who allegedly used coercive interrogation tactics on him; Gill also claimed that each detective was liable for failure to intervene against the other's coercive questioning.  850 F.3d 335, 340 (7th Cir. 2017).  The district judge entered judgment on the pleadings, and the Court of Appeals affirmed, finding the officers had qualified immunity.  The court concluded, first, that Gill had failed to show his right to be free from the interrogation tactics was clearly established.  *Id.* at 341–42.  It followed then, that "the detectives would not have known a constitutional violation was committed," and therefore could not be liable for failure to intervene against each other's questioning.  *Id.* at 342.

Plaintiffs throughout the encounter." (Pl. Opp. at 11.) And even that statement is inaccurate: the video does not depict Styczynski observing Cerda or the Unknown Officer using their batons on Lazendra or Willie.

Plaintiffs' failure to intervene claims are dismissed.

### D. Unlawful Seizures and False Arrest

A seizure occurs under the Fourth Amendment "if a reasonable person would not feel free to leave" an encounter with a police officer. *United States v. Cade*, 93 F.4th 1056, 1060 (7th Cir. 2024). The Seventh Circuit has identified two basic kinds of seizures: full-blown arrests, and "investigatory stops" limited to "brief, non-intrusive" detentions. *Id.* All three Plaintiffs claim that Styczynski seized them without probable cause. (Pl. Opp. at 6.) Lawrence was in fact arrested for disorderly conduct, but because Lazendra and Willie were not arrested (Defs. 56.1 ¶ 38, 80; Pl. 56.1 ¶ 26; Pl. Opp. at 16), any such seizure would have been an "investigatory stop."

Defendants dispute that Lazendra or Willie were seized at all (*see* Defs. Mem. at 5–6), but the court need not decide that issue here, as the evidence does not support Plaintiffs' notion that *Styczynski* was involved in any seizure of Lazendra or Willie.[14] Plaintiffs' assertion that Lazendra and Willie had "no way" of knowing who Styczynski intended to arrest strains credulity: the video at the heart of this case shows that when Styczynski yells "you're going to jail" at the 1:57 mark, Styczynski *is pointing his finger directly at Lawrence*, and then immediately apprehends Lawrence. (See Video at 1:51–2:02.) Further, Styczynski is not the officer who took the keys to Lazendra's car; it was Cerda who did so, more than 15 seconds *after* Styczynski announced his intent to arrest Lawrence. (See Pl. 56.1 ¶¶ 28–29 (explaining that Cerda took the keys); Video at 2:12–2:20.) Finally, the officer who pursued Willie as he fled the scene (and allegedly struck Willie with a baton) was not Styczynski; at the time Willie fled, Styczynski was apprehending Lawrence. (Defs. 56.1 ¶¶ 41, 70; Video 2:00–2:10.)

---

[14] The question of whether Lazendra or Willie were seized by officers other than Styczynski is relevant for those Plaintiffs' state law false imprisonment claims, which are discussed below.

Lawrence's Fourth Amendment false arrest claim against Styczynski has more traction but ultimately fails as well. To make out such a claim, Lawrence "must show there was no probable cause" to arrest him for disorderly conduct. *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022). Probable cause to arrest exists "when the facts and circumstances that are known to the officer reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Id.* That belief need not "be correct or even more likely true than false, so long as it is reasonable." *Id.* at 549.

Disorderly conduct is defined broadly under Illinois law as the performance of "any act in such unreasonable manner as to alarm or disturb another and provoke a breach of the peace." *Gaddis*, 30 F.4th at 631 (quoting 720 ILCS 5/26-1(a)(1)). The Illinois courts have described activities constituting disorderly conduct as "so varied and contingent upon surrounding circumstances as to almost defy definition." *People v. McLennon*, 957 N.E.2d 1241, 1249, 2011 IL App (2d) 091299, ¶ 30 (2011); *see also People v. Eyler*, 153 N.E.3d 1012, 1018, 2019 IL App (4th) 170064, ¶ 22 (2019) ("disorderly conduct is loosely defined. As a highly fact-specific inquiry, it embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.")

Because disorderly conduct is so fact-specific, to show a clearly established rule in his favor and overcome Styczynski's qualified immunity defense, Lawrence would likely need to present controlling case law dealing with a scenario substantially similar to his. But he has not done so. Lawrence notes the Seventh Circuit's observation in *Biddle v. Martin* that "arguing with a police officer, even in a loud, offensive manner, may not, by itself constitute disorderly conduct." 992 F.2d 673, 677 (7th Cir. 1993). But as the *Biddle* court clarified, and Lawrence also acknowledges, such behavior *can* be disorderly conduct "depending on the circumstances and the argument's tendency to create public disorder." *Id.*; (Pl.'s Opp. at 8.) The vagueness of that statement of law spells trouble for Lawrence, and indeed, Plaintiffs' briefing does not even attempt to explain how the facts of *Biddle* or any other case establish a clear rule in Lawrence's favor on

disorderly conduct— and recall that qualified immunity, once raised by defendant, puts the burden of proof on the plaintiff.

The court also concludes that there was no constitutional violation here because Styczynski had probable cause to arrest Lawrence for disorderly conduct. For a defendant's conduct to "breach the peace" and become disorderly, the conduct generally "must threaten another or have an effect on the surrounding crowd." *People v. Pence*, 100 N.E.3d 218, 222, 2018 IL App (2d) 151102, ¶ 17 (2018). Yet Illinois courts have upheld convictions for disorderly conduct stemming from disturbances much closer to annoyances than threats to the public. For instance, in *People v. Albert*, the defendant was convicted of disorderly conduct because she "shouted loudly and for several minutes in a residential neighborhood at a time when most people (including the complaining witness) had a reasonable expectation of peace and quiet." 243 Ill.App.3d 23, 26, 611 N.E.2d 567, 569 (1st Dist. 1993). In *Biddle*, Plaintiffs' leading case on this issue, the intoxicated arrestee had been screaming profanities at a police officer for 10 minutes and making "violent arm gestures" in protest after being told that his car would be towed. 992 F.2d at 677. All of this took place, however, "on a deserted roadway at 3:00 AM"; that is, with no one else to disturb but the officer and certainly without an audience. *Id.* Even so, the Seventh Circuit found that the police officer could reasonably believe the belligerent Biddle's conduct amounted to a breach of the peace because "resistance to the tow *might* escalate once the tow truck arrived, generating a real *possibility* of physical confrontation between Biddle and the tow truck driver or the police officers." *Id.* at 678 (emphasis added).

In this case, Lawrence had been angrily confronting and shouting at Styczynski for a little under two minutes prior to the arrest. Shouting alone would not justify an arrest, but here it occurred in the backdrop of looting at The Brickyard mall and in the immediate presence of about 10 onlookers very close to where Lawrence and Styczynski's confrontation reached a crescendo. *Biddle* recognizes that police officers have leeway to make arrests where disorder could even

possibly follow from an argument. The court concludes that Styczynski had probable cause to arrest Lawrence for disorderly conduct. Lawrence's false arrest claim fails.

### E. Excessive Force

All three Plaintiffs have made excessive force claims against Styczynski. For Lazendra and Willie, these claims, too, fall short. As explained earlier, there is no evidence that *Styczynski* deployed force against Lazendra or Willie. As such, the court limits its excessive force analysis to the interaction between Styczynski and Lawrence.

The Fourth Amendment prohibits the use of excessive force to seize a person, whether the seizure constitutes an "arrest" or "investigatory stop." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). To determine whether an officer's use of force was excessive, courts "must evaluate whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting that officer." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). This "reasonableness" inquiry is particularly concerned with three factors: (i) the severity of the crime at issue, (ii) whether the suspect poses an immediate threat to the safety of the officers or others, and (iii) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 996. Because the reasonableness inquiry "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Seventh Circuit has cautioned that summary judgment should be granted "sparingly" in excessive force cases. *Id.* Even where the defendant raises a qualified immunity defense, summary judgment will not be appropriate if the evaluation of immunity requires "the same assessment of the material fact[s] at issue" in the substantive claim. *Id.* at 1001.

A reasonable jury could conclude on this record that Styczynski deployed excessive force against Lawrence in violation of the Fourth Amendment. Critically, the court finds that the degree of resistance by Lawrence to his arrest, if any, and the degree and kind of force used by Styczynski to effect the arrest are in genuine dispute. Lawrence's version of the story is that, once Styczynski announced his intent to arrest Lawrence (shouting "you're going to jail!"),

Lawrence was very quickly thrown to the ground by Styczynski and an assisting police officer, and once Lawrence was already on the ground, restrained by Styczynski's body weight, Styczynski struck Lawrence with his baton. The video evidence shows little of this portion of the interaction and does not refute Lawrence's account. Furthermore, a jury could reasonably conclude that Lawrence did not pose an immediate threat to Styczynski: after all, even if Lawrence were angry and aggressive, there is no evidence in the record that he was armed or ever made efforts to attack Styczynski. Finally, it is beyond dispute that Lawrence was not arrested for a serious crime: disorderly conduct is a Class C misdemeanor, the lowest form of a criminal offense in Illinois. *See* 720 ILCS 5/26-1(a)(1); 720 ILCS 5/26-1(b).

Viewing these facts in the light most favorable to Lawrence, the court also finds that Styczynski's conduct violated a clearly established Fourth Amendment right. Case law confirms that "only minimal force is warranted where the accused is only passively resisting," and that "police officers cannot continue to use force once a suspect is subdued." *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016); (*see also* Pl. Opp. at 13 (citing *Abbott v. Sangamon Cnty, Ill.*, 705 F.3d 706, 732 (7th Cir. 2013)) (well-established that officers cannot "use significant force on nonresisting or passively resisting subjects").) Active resistance is defined as failure to "respond to the first physical contact by complying with the officers' commands," in contrast with *passive* resistance—simple refusal "to move or follow lawful commands." *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). The Seventh Circuit "has not announced any test" for determining what force is "minimal," but has previously found examples of minimal force to include "removing an unresponsive, passively noncompliant driver from his car," and "holding an intoxicated, actively-resistant person's wrist in a 'wrist lock' technique to prevent her from freeing herself from handcuffs while in an ambulance." *Carranza v. Pool*, 623 F. Supp. 3d 936, 947 (C.D. Ill. 2022) (citing *Smith v. Ball State Univ.*, 295 F.3d 763, 770–71 (7th Cir. 2002) and *Fitzgerald v. Santoro*, 707 F.3d 725, 734–35 (7th Cir. 2013)). A reasonable jury in this case could conclude that Lawrence was thrown to the ground and then struck in the back with a baton while already

pinned to the ground by Styczynski, all despite having offered little, if any, resistance to his arrest. This use of force would eclipse the "minimal" examples previously offered by the Seventh Circuit.

Defendants' position that Styczynski's use of force was reasonable, and thus not constitutionally suspect to begin with, rests on two contentions. First, as noted, Defendants contend Lawrence "has not presented any evidence that Styczynski was personally responsible" for the baton strike that Lawrence allegedly sustained when he was already face down on the ground. (Defs. Reply at 7.) Second, assuming that Styczynski was involved, and that he used force in taking Lawrence to the ground and placing his knee on Lawrence's back, Defendants contend that use of force was appropriate given Lawrence's level of resistance, which the Defendants have characterized as "active." (*See id.* at 8; Defs. Mem. at 12–13.) Neither argument has merit.

To begin, it is simply not true that Lawrence has "not presented any evidence" that Styczynski was the one who struck him with a baton once Lawrence was on the ground. True, Lawrence admits he did not s*ee* Styczynski strike him and did not know that Styczynski administered the strike. But Lawrence has presented circumstantial evidence that would allow a jury to conclude that Styczynski was indeed the one who struck Lawrence: Styczynski was one of two officers who threw him to the ground and of those two, Styczynski was the only one wielding a baton.

Defendants have also incorrectly framed the analysis of resistance to arrest in the Fourth Amendment context. Defendants relate that, during the encounter, Styczynski "repeatedly ordered Lawrence to calm down and stay back," that Lawrence "did not respond to any of" these lawful commands, and that Lawrence's flaunting of these commands while advancing toward Styczynski and screaming at him "qualified as active resistance." (Defs. Mem. at 12–13.) What matters here, however, is the "force used when a seizure occurs." *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009). In other words, the focus in this claim is how Lawrence responded to Styczynski *after* Styczynski announced his intention to arrest Lawrence and moved

to apprehend him. The notion that Lawrence disregarded Styczynski's orders earlier in the encounter—while relevant to questions of fact such as whether Lawrence posed a threat to Styczynski under the circumstances, and whether Lawrence's conduct had a tendency to create public disorder—does not factor into an analysis of Lawrence's resistance to arrest. And in any case, Lawrence's failure to move and/or follow commands from Styczynski would only qualify as "passive" resistance under Seventh Circuit law, and not "active" resistance as Defendants claim.

Nor is qualified immunity a basis for summary judgment on this claim. In conducting the qualified immunity inquiry, this court is bound and guided by controlling Supreme Court and circuit precedent; only if no such controlling precedent exists should a court broaden its survey "to include all relevant caselaw." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). In arguing that "the available case law would not have indicated to Styczynski that the force used in arresting Lawrence was unlawful," Defendants overlook a raft of published Seventh Circuit opinions on this topic, including the cases cited above, and instead present three cases, two of them unpublished, and all distinguishable. (*See* Defs. Mem. at 14–15.) None of those cases are controlling precedent, and in any event, they are not persuasive here.

Defendants first cite *Dominguez v. Park City* for the proposition that "courts have found the use of varying degrees of force to be justified in a wide variety of settings involving passive resisters and individuals refusing to obey directives." No. 19 C 5327, 2023 WL 2664393, at *7 (N.D. Ill. Mar. 28, 2023). *Dominguez* concerned events that took place in the booking room of the Park City, Illinois police station after the plaintiff had been arrested on suspicion of driving under the influence. *Id.* at *1. The court in *Dominguez* analyzed quite a few alleged uses of force by the Park City police and found only a small set to be objectively reasonable, such that the defendant officers were entitled to summary judgment on Dominguez's corresponding claims. The acceptable uses of force took place in a sequence occurring at 1:53 AM, after Dominguez had been escorted from a booking room to the bathroom at the police station. *Id.* at *2. Once inside the bathroom, Dominguez was "clearly refusing to come out" so that he could have his

fingerprints taken. *Id.* at *7. An officer then "forcibly pushed or pulled a visibly resisting Dominguez to the fingerprint station." *Id.* Once Dominguez was at the fingerprint station, multiple defendant officers attempted to "free Dominguez's arms and pry apart his fists in order to fingerprint" the intoxicated Dominguez. *Id.* Finally, the court accepted as true Dominguez's assertion that the officers then brought Dominguez to a bench and "pushed him into a seated position," which caused Dominguez to bump his head against a wall. *Id.* at *2, 7. The district court held that these uses of force in the 1:53 AM sequence did not violate the Fourth Amendment. *Id.* at *7.

*Dominguez* is not sufficiently analogous to be compelling here. Taking the facts in this case in the light most favorable to Lawrence, the force allegedly used against Lawrence (being thrown to the ground and then struck in the back with a baton while already restrained) was clearly greater than the acceptable measures deployed against Dominguez, and that the minimal degree of resistance exhibited by Lawrence once Styczynski announced his arrest was less significant than Dominguez's refusal to exit the police bathroom or allow himself to be fingerprinted.

Defendants next point to *Cherry v. Washington Cnty. Wis.*, in which the plaintiff asserted that arresting officers had "pushed him to the ground and pressed his face against the road, causing excruciating pain," and the court granted summary judgment on plaintiff's excessive force claim. 526 F. App'x 683, 686 (7th Cir. 2013). Defendants omit important context from the *Cherry* opinion. First the district court in *Cherry* had found, as a factual matter, that only "modest force" had been used to control Cherry, causing "at most only temporary pain and discomfort." *Id.* at 687–88. Second, unlike Lawrence, "Cherry was under arrest for a serious crime—a home invasion," and the officers believed he "might be armed with a weapon" from the residence he had allegedly burgled. *Id.* at 686, 688.

Defendants' final case on this issue is *Felarca v. Birgeneau*, which concerned the actions of University of California, Berkeley police officers during an Occupy Wall Street-inspired campus protest in 2011. 891 F.3d 809, 810 (9th Cir. 2018). Defendants offer that, in *Felarca*, the Ninth

Circuit found the use of "overhand" baton strikes against protestors to be justified as part of the officers' efforts to disperse protestors who were preventing the officers from taking down tents erected in violation of university policy. *Id.* at 818. Defendants also highlight the fact that the officers in *Felarca* were "greatly outnumbered by the protestors and verbally and physically provoked." *Id.* at 818. Again, Defendants have omitted facts that distinguish *Felarca* from this case. The protestors in *Felarca* were "directly interfer[ing] with officers' attempt[s] to enforce university policy by linking arms to block officers' access to the tents." *Id.* And critically, "the only plaintiff alleging an overhand strike" by an officer had "[taken] the interference a step further" by "pushing and kicking" at officers and grabbing at their batons. *Id.* Here, it is undisputed that Lawrence never attempted to physically restrain Styczynski from accomplishing some objective, and that Lawrence never pushed, kicked, or otherwise struck at Styczynski.

Lawrence's Fourth Amendment excessive force claim survives summary judgment. Having addressed the last of Plaintiffs' claims under federal law, the court now turns to Plaintiffs' state law claims.

## II. State Law Claims: Intentional Infliction of Emotional Distress, False Imprisonment, Battery, Assault

### A. State Law Qualified Immunity

In opposition to Plaintiffs' state law claims, Defendants have generally raised a defense of state-law qualified immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Immunity Act"). That Act shields public employees from liability for any "act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *Banks v. City of Rockford*, 227 N.E.3d 816, 820, 2023 IL App (4th) 221111, ¶ 17 (2023) (quoting 745 ILCS 10/2-202). The Immunity Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.* (quoting 745 ILCS 10/1-210). "Determining whether a public

employee's actions amount to willful and wanton conduct is normally a question of fact to be resolved by a jury." *Agwomoh v. Vill. of Dolton*, 224 N.E.3d 773, 784, 2022 IL App (1st) 210892, ¶ 65 (2022). "A court may hold as a matter of law that the employee's actions did not amount to willful and wanton conduct where no other contrary conclusion can be drawn from the record presented." *Id.*

Plaintiffs have failed to respond to Defendants' state-law qualified immunity arguments. That failure, though disappointing, is not dispositive of the state law claims: in contrast to the federal qualified immunity doctrine, the Illinois courts have held that "it is a public entity's burden to assert *and prove* an immunity provided" by their state's equivalent Tort Immunity Act. *Wright-Young v. Chicago State Univ.*, 153 N.E.3d 185, 198, 2019 IL App (1st) 181073, ¶ 61 (2019) (emphasis added). Here, the City is potentially liable for the conduct of Styczynski, Cerda, and the officer who allegedly struck Willie with a baton. (Recall that the City can be liable for the conduct of Cerda and the unidentified officer via *respondeat superior* even though the two officers are not defendants in this case. *See supra* at p. 14.) On this record, the court is unable to say that no reasonable jury could believe the conduct of Styczynski, Cerda, or the officer who allegedly struck Willie with a baton was "willful and wanton." Defendants are not entitled to summary judgment on the state law qualified immunity defense.

The court turns now to the merits of Plaintiffs' state law claims.

### B. Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress ("IIED"), a plaintiff must show that "(1) the defendant's conduct was extreme and outrageous, (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would cause emotional distress, and (3) the defendant's conduct in fact caused severe emotional distress." *Lopez Colunga v. Advoc. Health & Hosps. Corp.*, 232 N.E.3d 72, 76, 2023 IL App (1st) 211386, ¶ 9 (2023). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not constitute extreme and outrageous conduct" for the

purposes of an IIED claim; rather the nature of the defendant's conduct must be "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Taliani v. Resurreccion*, 115 N.E.3d 1245, 1254, 2018 IL App (3d) 160327, ¶ 26 (2018). Similarly, "fright, horror, grief, shame, humiliation, worry, and other such mental conditions" do not rise to the level of "severe" emotional distress. *Id.* Instead, the Illinois courts have been more inclined to characterize emotional distress as "severe" where the distress has "manifested itself either through physical symptoms or has necessitated medical treatment." *Honaker v. Smith,* 256 F.3d 477, 495 & n. 19 (7th Cir. 2001) (collecting Illinois cases).

Plaintiffs have not produced evidence that they suffered "severe" emotional distress in the sense contemplated by the law. In their Second Amended Complaint, Plaintiffs allege that they have all been diagnosed with "various and serious forms of emotional injuries ranging from severe Post Traumatic Stress Disorder (PTSD) to Conversion Disorder." ([27] ¶ 36.) But Plaintiffs have presented no admissible evidence of such diagnoses. Indeed, Plaintiffs' Opposition and Statement of Material Facts do not even mention such diagnoses, much less direct the court to the testimony of any person who would have made or documented the diagnoses. [15]

Further, even accepting Plaintiffs' claims of emotional injury, the court is not persuaded that Styczynski and Cerda's conduct was "extreme and outrageous." True, Styczynski and Cerda were acting in their capacity as police officers, and courts have found that the extreme and outrageous nature of challenged conduct may arise from defendant's "abuse of some position that gives him authority over the plaintiff or the power to affect the plaintiff's interests." *Sun v. Xu*, 99 F.4th 1007, 1013 (7th Cir. 2024) (quoting *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50,

---

[15] Plaintiffs' own testimony concerning such diagnoses by psychiatrists or other mental health professionals would be hearsay that does not fall under the exception created by Fed. R. Evid. 803(4) for statements made for medical diagnosis or treatment. *See Youngman v. Peoria Cty.*, 947 F.3d 1037, 1043 (7th Cir. 2020) (the limited exception set forth by the rule is "for statements that *patients* make to their physicians for purposes of medical diagnosis or treatment"); *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) ("To be considered on summary judgment, evidence must be admissible at trial"; "if the evidence is inadmissible hearsay, the courts may not consider it.")

63, 2016 IL 120041, ¶ 52 (2016); *see, e.g.*, *Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1135, 1172 (N.D. Ill. 2022) (denying summary judgment on an IIED claim under Illinois law where a reasonable jury could conclude the defendant police detective fabricated court-reported statements placing the plaintiff at the scene of an arson that killed two people.)  Illinois courts have held, however, that a police officer arresting a non-resisting citizen in a gratuitous and humiliating manner, even where the arrest conduct involves a constitutionally suspect use of force, does not constitute outrageous or extreme conduct.

In *Anderson v. Village of Forest Park*, the plaintiff's encounter with police took place after "someone made an emergency 911 telephone call to the Village Police Department," saying that "plaintiff's aunt wanted plaintiff removed from her residence" and requesting police assistance. 238 Ill. App. 3d 83, 85, 606 N.E.2d 205, 207 (1st Dist. 1992).  According to the plaintiff, five minutes after that 911 call, police officers arrived at her aunt's home and

> (a) interrogated her for several hours; (b) searched through her dresser and other belongings; (c) refused to allow her to use the bathroom; (d) refused to allow her to change out of her nightgown and into street clothes; (e) refused to tell her why they were there other than to threaten that if she did not answer their questions, she would be involuntarily committed; (f) arrested her and refused to tell her why she was under arrest; and (g) bodily removed her from her bed, without provocation, need, or explanation, and dragged her in her nightgown down the steps and outside.

*Id.*  Plaintiff also reported to the officers, during this encounter, that she suffered from multiple sclerosis.  At no point did she "attempt to resist arrest or act violently."  *Id.* at 86, 606 N.E.2d at 207.  The trial court nevertheless concluded the officers were shielded from liability for an excessive force claim by qualified immunity, and dismissed plaintiff's IIED claim against the officers "on the basis that it did not allege extreme and outrageous conduct."  *Id.* at 96, 606 N.E.2d at 214.  The Illinois Appellate court reversed the qualified immunity determination but agreed with the trial court that the underlying IIED claim failed.  *Id.*

The Illinois Supreme Court has recognized that the conduct of law enforcement officers can be "extreme and outrageous," but has done so in a case where the alleged events were far more compelling than those before this court.  In *Doe v. Calumet City*, plaintiff Jane Doe alleged

that defendant officers responded to a 911 call at an apartment building just after 4:30 AM; when they arrived, they found the plaintiff dressed only in underwear, locked out of her apartment, and in the company of concerned neighbors.  161 Ill. 2d 374, 381, 641 N.E.2d 498, 502 (1994). Plaintiff told the officers that there was a man in her apartment who had tried to rape her and had threatened to kill her and her children; she also told the officers that her children were still inside the apartment and that she feared for their safety.  *Id.*  Jane alleged that she and her neighbors pleaded with the officers to break down the door to Jane's apartment.  *Id.*  The officers declined to do so because, as the supervising officer explained, they "did not want to be responsible for the property damage," even after Jane repeatedly stated that she would pay for any damage to the door.  *Id.*  Jane alleged, further, that the officers even physically restrained her and her neighbors from breaking down the door; instead, one of the officers called the building's landlord, who lived in another town, and requested a key.  *Id.*  The lead officer then proceeded to interrogate Jane in a "demeaning manner", asking her: "Where is your husband?" "Do you know the guy?" "Why would you leave your children in the apartment if there was a strange man there?" and "Why did you leave the apartment without a key?"  *Id.*  Reversing an order dismissing the complaint, the Illinois Supreme Court held that these allegations stated a claim against the responding officers for intentional infliction of emotional distress.  *Id.* at 509.

This case obviously differs.  Styczynski and Cerda's conduct, even in Plaintiffs' account, falls short even of the very troublesome police conduct in *Anderson*, which was held not to be "outrageous and extreme."  Plaintiffs' claims for intentional infliction of emotional distress fail.

### C.  False Imprisonment

Under Illinois law, "a claim for false imprisonment requires a showing that the plaintiff was restrained or arrested by the defendant and that the defendant acted without having reasonable grounds or probable cause."  *Farwell v. Senior Servs. Assocs., Inc.*, 970 N.E.2d 49, 54, 2012 IL App (2d) 110669, ¶ 12 (2012).  An unlawful restraint does not require the use of actual force: the actor "may bring about the confinement required" through the imposition of "actual or apparent

physical barriers," "threats of physical force," "other duress," or "asserted legal authority." *Lopez v. Winchell's Donut House*, 126 Ill. App. 3d 46, 50, 466 N.E.2d 1309, 1312 (1st Dist. 1984) (citing Restatement (Second) of Torts §§ 38–41 (1965)). However, the plaintiff must also establish that the defendant "actually or legally intended the restraint." *Russell v. Kinney Contractors, Inc.*, 342 Ill. App. 3d 666, 675, 795 N.E.2d 340, 347 (5th Dist. 2003).

The parties essentially invite the court to treat the Plaintiffs' state law false imprisonment claims identically to their Fourth Amendment unlawful seizure claims (leaving aside the federal quality immunity defense): Defendants have incorporated by reference their arguments against Plaintiffs' analogous federal claims (*see* Defs. Mem. at 23), and Plaintiffs have not briefed the issue separately from their federal claims at all.[16] (*See* Pl. Opp. at 6–8.) The court accepts this invitation in part. The facts underlying the state and federal claims are essentially the same and need not be rehashed. The court will, however, conduct a brief analysis, applying Illinois case law on the false imprisonment tort, rather than federal case law on Fourth Amendment seizures.

Lawrence's claim for false imprisonment fails for essentially the same reasons as his federal unlawful arrest claim. Styczynski's federal qualified immunity defense does not extend to state law claims, so Lawrence does not need to show that his rights in this situation were clearly established to succeed on the false imprisonment claim. But the court has already determined that Styczynski had probable cause to arrest Lawrence for disorderly conduct. *See supra* at p. 19–21. And under Illinois law, "probable cause is an absolute bar to a claim for false imprisonment." *Grainger v. Harrah's Casino*, 18 N.E.3d 265, 276, 2014 IL App (3d) 130029, ¶ 38 (2014). Lawrence's false imprisonment claim fails.

Lazendra and Willie's false imprisonment claims also cannot survive summary judgment. As stated above, the evidence in this case does not support Lazendra's and Willie's claim that

---

[16] Given the similarity between the unlawful seizure and false imprisonment claims, the court declines to consider the false imprisonment claims "abandoned," as Defendants suggest. (Defs. Reply at 13.)

they were seized or restrained by Styczynski.  *See supra* at p. 18.  However, Plaintiffs also argue that Lazendra and Willie were seized when Cerda took the keys to the Plaintiffs' car, as shown toward the end of the video.  (*See* Pl. Opp. at 7 ("Lazendra and Willie, contrary to what Defendants argue, were not in fact allowed to leave as a defendant officer had taken their vehicle's keys, eliminating any means of freedom to leave.") (cleaned up).)

With respect to Willie, this argument is completely untenable.  By the time Cerda entered Plaintiffs' car and took the keys, Willie had fled the scene of the incident about ten seconds earlier. Plaintiffs have not explained how actions taken by Cerda *after* Willie had fled the scene could qualify as a restraint on Willie.  His false imprisonment claim fails.

Lazendra's false imprisonment claim based on Cerda's actions is slightly more plausible, but also fails.  The court ultimately agrees with Defendants that Lazendra was not restrained by Cerda in the first place.  (*See* Defs. Mem. at 23.)[17]  In a different case, the police taking a civilian's car keys might support a claim of false imprisonment if the confiscation had the intent and effect of confining the civilian to a particular area.  In this case, however, Plaintiffs' argument that Cerda taking the keys to the vehicle eliminated Lazendra's freedom to leave the scene is unsupported. As a practical matter, it would have been very simple for Lazendra to walk away from the scene of this encounter, and Plaintiffs have not pointed to any evidence in the record that Cerda created, or intended to create, an actual impediment to Lazendra leaving the scene on foot.  While Lazendra may have had good reasons to remain at the scene after the car keys were confiscated, like keeping an eye on Lawrence and the car (which apparently still contained her purse), that does not equate to Cerda having confined Lazendra to the scene of the encounter.

---

[17]     Neither party has meaningfully addressed whether Lazendra's confinement by Cerda, if it occurred, was unlawful.  Defendants were apparently confident enough that Lazendra was *not* restrained at all that they chose not to brief the issue.  Meanwhile, the relevant section of Plaintiffs' Opposition transitions directly from arguing that Lazendra and Willie were seized to simply concluding—without any additional discussion of the facts and without citing a single case—that the same facts could lead a jury to find that Lazendra and Willie were unlawfully seized.  (*See* Pl.'s Opp.at 6–7.)

### D. Battery

Both Plaintiffs and Defendants cite 720 ILCS 5/12-3 for the proposition that, under Illinois law, "a person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."  (Defs. Mem. at 21; Pl. Opp. at 16.)  But this is the statutory definition of *criminal* battery, which is distinct from the civil battery tort that Plaintiffs are attempting to bring. The elements of a claim for civil battery are: (1) an intentional act on the part of the defendant, (2) resulting in offensive contact with the plaintiff's person, and (3) lack of consent to the defendant's conduct.  *Obermeier v. Nw. Mem'l Hosp.*, 134 N.E.3d 316, 333–34, 2019 IL App (1st) 170553, ¶ 62 (2019).

With respect to Lawrence and Lazendra's claims against the City, Defendants concede that Styczynski and Cerda used some amount of force against Lawrence and Lazendra, respectively, but argue that the two Plaintiffs' battery claims must fail because Styczynski and Cerda's uses of force were reasonable and legally justified.  (*See* Defs. Mem. at 22–23.) Defendants deny that Willie has stated a claim for battery against the City at all (*see id.* at 22), but the court will treat Defendants as having raised the same "legally justified" defense as to the unidentified officer's alleged striking of Willie with a baton.

In support of their argument that any use of force by the officers was legally justified, Defendants point to an Illinois statute which reads, in relevant part:

> A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes, based on the totality of the circumstances, to be necessary to effect the arrest and of any force which he reasonably believes, based on the totality of the circumstances, to be necessary to defend himself or another from bodily harm while making the arrest.

720 ILCS 5/7-5(a).  Defendants suggest that courts have "regularly applied" this provision of the Illinois criminal code "in ruling on civil battery claims."  (Defs. Mem. at 22.)  The court is not

persuaded, as the three unpublished decisions Defendants cite are distinguishable.  (*See id.*)[18]
The Illinois Appellate Court has confirmed that even where the civil battery defendant is a police
officer, the relevant affirmative defense is still common law "self-defense."   *Boyd v. City of
Chicago*, 378 Ill.App.3d 57, 69, 880 N.E.2d 1033, 1035, 1044 (1st Dist. 2007).  Factors to consider
in determining whether a person acted in self-defense are: (1) whether the individual was the
aggressor; (2) whether the danger of harm was present; (3) whether unlawful force, either criminal
or tortious, was threatened; (4) whether the individual actually believed danger existed, his use of
force was necessary to avoid harm, and that the amount of force he used was necessary; and (5)
whether the individual's use of force was reasonable even if mistaken.  *Id.*  Unsurprisingly, this
five-part, fact-intensive inquiry is often reserved for the jury.  *See First Midwest Bank of Waukegan
v. Denson,* 205 Ill. App. 3d 124, 129, 562 N.E.2d 1256, 1259–60 (2d Dist. 1990) (collecting cases
and describing instructions provided to the jury on the question of self-defense).  The amount of
force that Styczynski and Cerda deployed against Lawrence and Lazendra is genuinely disputed,
as is the question of whether the officers used such force in self-defense.  Lawrence and
Lazendra's state law battery claims thus survive summary judgment.

Willie's battery claim, though somewhat thin, also survives this motion.  Because the video
evidence clearly shows that Willie *was*, in fact, pursued by an officer as he ran from the scene of
the encounter, there is at least some circumstantial evidence to accompany Willie's testimony
that the officer struck him on the backside with a baton.  Whether this use of force occurred, and
whether, if so, it was deployed in self-defense, are questions for the jury.

---

[18]     Defendants provide one unpublished Seventh Circuit opinion, and two unpublished
opinions from this court.  The Seventh Circuit case, *Cross v. City of Chicago*, does not cite to
Defendants' favored provision at all, but rather to a separate statute dealing with criminal trespass.
4 F.3d 996 (Table), 1993 WL 339714, at *1 (7th Cir. Sept. 2, 1993) (citing 720 ILCS 5/21-3).  The
court further notes that, as Plaintiffs point out, on its face 720 ILCS 5/7-5 seems to apply only
where the officer has effectuated an arrest.  (*See* Pl. Opp. at 16.)  And indeed, all three of the
cases Defendants raise involve uses of force in case of arrests.  *See Cross*, 1993 WL 339714 at
*1; *Nelson v. City of Chicago*, No. 08 C 4754, 2010 WL 1978610, at *1, 3 (N.D. Ill. May 14, 2010);
*Elliott v. Spencer*, No. 92 C 20082, 1993 WL 114534, at *1 (N.D. Ill. Apr. 8, 1993).  Here, only
Lawrence was arrested.  (Defs. 56.1 at ¶ 38.)

### E. Assault

Under Illinois law, the tort of assault "can be defined as an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Schweihs v. Chase Home Fin. LLC*, 187 N.E.3d 1196, 1216, 2021 IL App (1st) 191779, ¶ 58 (2021). More specifically, the Illinois Appellate Court appears to have adopted the Second Restatement of Torts' requirement that the defendant have "acted with the intent to cause either a harmful or offensive contact with the plaintiff's person (or the person of a third party) or an imminent apprehension of such a contact." *Id.* (quoting Restatement (Second) of Torts § 21(1) (1965)).

Plaintiffs generally argue that Styczynski and Cerda, collectively, committed assault both by initially "run[ing] up to" Plaintiffs' vehicle "swinging their batons," followed by Cerda's smashing the back window, and later by the officers' "attempting to hit" Plaintiffs with their batons throughout the encounter. (Pl. Opp. at 15.) Even viewing the relevant facts in the light most favorable to Plaintiffs, Styczynski did not commit an assault against any of the Plaintiffs when he initially approached Plaintiffs' vehicle. No evidence supports Plaintiffs' assertion Styczynski or Cerda were swinging their batons when they supposedly ran up to the Plaintiffs' vehicle, and in fact, Plaintiffs have not pointed to any evidence that either Lazendra or Willie saw the officers approach their vehicle at all: they have only cited to Lawrence's testimony that he saw the approach. Finally, Plaintiffs have cited no evidence to contradict Styczynski's claim that, once he arrived at the vehicle, he did no more than tap on the vehicle with his baton, telling the Plaintiffs to move along. All told, Plaintiffs simply have not made a case that, in the initial moments of the encounter, Styczynski attempted to make harmful contact with Plaintiffs' persons or took any action that the jury could infer was intended to create imminent apprehension of such contact.

What happened next, however, is that Cerda shattered Plaintiffs' car window. Whether Cerda's actions could support liability for assault presents a closer question with respect to

Plaintiff Lawrence (again, there is no evidence that Lazendra or Willie saw Cerda approach the car, much less hit the rear window). Essentially, what Lawrence has alleged is that he was in a car stuck in traffic just outside The Brickyard mall, that he saw Styczynski and Cerda either chasing or roughing up a couple of people at the scene, that he and the two officers then had a verbal altercation, and that this led the two officers to run toward the car, after which Cerda smashed the back window. Cerda claims his smashing the back window was unintentional, but a jury could easily infer the opposite. Though Cerda's smashing the back window was not an attempt to contact Lawrence's person, Lawrence's testimony could support a finding that Cerda's conduct intended to create an "imminent" apprehension of such contact in Lawrence, and that his fear of such imminent peril was reasonable.

Plaintiffs also contend that Styczynski or Cerda committed an assault *after* Cerda smashed the back window. Specifically, Plaintiffs assert that, during the encounter, they "were retreating as officers were swinging their batons and hitting them," and that "the video shows that Plaintiffs moved away from the officers and officers were in fact advancing on the plaintiffs continually attempting to hit the plaintiffs." (Pl. Opp. at 15.) In fact, in the court's view, the first portion of the video mostly shows Plaintiffs confronting or advancing on the officers after Cerda has shattered the back windshield, demanding that the officers call a supervisor and provide their names and badge numbers.

Nonetheless, the court finds that a reasonable jury could conclude an assault took place at one more junction: by Styczynski against Lawrence, in the moments just before Lawrence was taken to the ground and arrested. Recall that after about one minute and forty seconds of Lazendra's cell phone video, at a point when the Plaintiffs have followed Styczynski and Cerda back to their blue police vehicle, Lazendra calls for Lawrence and Willie to walk back to *their* car and away from the police officers because she had captured the events on video. Neither Lawrence nor Styczynski appear in the next ten seconds or so of the video. When they reappear in the footage, the two have travelled south down Narragansett, *away* from the police vehicle, and

Styczynski is now swinging the baton at Lawrence, who hops to avoid the baton as he apparently continues filming Styczynski with his camcorder. At summary judgment, neither party has presented a detailed account of how or why Styczynski followed Lawrence back down Narragansett and away from the police vehicle. A reasonable jury could view the baton swings either as affirmative attempts by Styczynski to hit Lawrence, or merely as attempts to create more space between them. And a reasonable jury might or might not be persuaded that, given all the circumstances, those baton swings were reasonable and lawful.

Defendants offer two challenges to the assault claims, but neither carries water. First, Defendants announce that the Seventh Circuit has "expressly held" that an assault *requires* the use of words, and that Plaintiffs' claims therefore fail because they "have not identified any specific threat or words from the officers that could constitute an assault." (Defs. Mem. at 20; *see also* Defs. Reply at 12 ("Plaintiffs failed to identify the verbal threats of violence that were made toward them").) In support of this argument, Defendants cite *Merheb v. Ill. State Toll Highway Auth.*, 267 F.3d 710, 714 (7th Cir. 2001). In *Merheb*, the Seventh Circuit, did in fact muse that "an assault requires words," citing to a common law case from medieval England and a 19th-century opinion from the Supreme Court of New Hampshire. *See id.* But there are two problems for Defendants. First, Illinois law controls here, and Defendants have not cited (and the court has not otherwise found) any Illinois court decision stating that the tort of assault *requires* the utterance of words. Second, the scholarly passage Defendants quote from *Merheb* is dicta, not addressing any issue before the Seventh Circuit in that case but rather commenting on a counterclaim raised by the defendant and dismissed by the district judge below. *Id.* In any event, later Seventh Circuit opinions confirm that an assault may be accomplished by a "threatening gesture," without a requirement of spoken words. *See Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2001); *United States v. Watts*, 798 F.3d 650, 652 (7th Cir. 2015).

Finally, Defendants insist that Plaintiffs could not have been in imminent fear of Cerda (or Styczynski) because, after Cerda shattered the Plaintiffs' back window, all Plaintiffs exited the

vehicle to confront the two officers, and later "advanced towards" the officers while the officers retreated. (Defs. Mem. at 21.) This is of course circumstantial evidence that Lawrence (the only Plaintiff with cognizable assault claims) was not put in fear of imminent peril by Cerda smashing the windshield, but it is not conclusive proof to that effect. And Lawrence's initial reaction to Cerda smashing the back window of the car says very little about his mental state later in the encounter, when Styczynski began swinging the baton at Lawrence immediately before arresting him.

## CONCLUSION

Defendants' motion for summary judgment [83, 84, 85] is granted in part and denied in part. Defendants Gollaza and Unknown Officers are dismissed from this case. The following claims survive summary judgment: (i) Lawrence's Fourth Amendment claim against Styczynski for excessive force; (ii) Lawrence's claim against the City for battery based on Styczynski's actions; (iii) Lazendra's claim against the City for battery based on Cerda's actions; (iv) Willie's claim for battery against the City based on an unidentified officer allegedly striking him with a baton; (v) Lawrence's claim against the City for assault based on Cerda's actions; and (vi) Lawrence's claim against the City for assault based on Styczynski's actions. All other claims are dismissed.

Dated: December 6, 2024

_____
REBECCA R. PALLMEYER
United States District Judge